**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Georgetown v. Brown Cty. Bd. of Elections,* **Slip Opinion No. 2019-Ohio-3915.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-3915

THE VILLAGE OF GEORGETOWN *v.* BROWN COUNTY BOARD OF ELECTIONS.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Georgetown v. Brown Cty. Bd. of Elections,* Slip Opinion No. 2019-Ohio-3915.]**

*Prohibition—Writ of prohibition sought by village to prevent board of elections from placing a tax-levy-reduction measure on the ballot—Village failed to show that the board of elections abused its discretion in reversing its prior decision to invalidate 12 petition signatures—Village failed to show that the tax-levy-reduction measure is not a proper ballot measure—Writ denied.*

(No. 2019-1216—Submitted September 20, 2019—Decided September 26, 2019.)

IN PROHIBITION.

_____

**Per Curiam.**

{¶ 1} In this expedited election case, relator, the village of Georgetown, seeks a writ of prohibition to prevent respondent, the Brown County Board of

Elections, from placing a tax-levy-reduction measure on the November 5, 2019 general-election ballot. For the reasons explained below, we deny the writ.

## I. Background

### A. *The voters approve a 9.5-mill levy*

{¶ 2} The taxing authority of a subdivision is authorized to levy taxes annually on real and personal property within the subdivision. As a general rule, the aggregate amount of taxes that may be levied on taxable property in any subdivision cannot exceed ten mills on each dollar of tax valuation in any one year (the so-called "ten-mill limitation"). R.C. 5705.02. In order to levy taxes in excess of the ten-mill limitation, a subdivision must submit the proposed levy to the voters of the subdivision for approval. R.C. 5705.07.

{¶ 3} The procedure for seeking a tax levy in excess of the ten-mill limitation is spelled out in R.C. 5705.19. Pursuant to that statute, at any time, a subdivision's taxing authority may approve, by a two-thirds vote, a resolution stating that the taxes that may be raised within the ten-mill limitation will be insufficient for the necessary requirements of the subdivision and that it is necessary to levy a tax in excess of the limitation. A tax in excess of the limitation may be levied only for specific purposes, one of which is stated in R.C. 5705.19(I):

> For providing and maintaining fire apparatus, mechanical resuscitators, underwater rescue and recovery equipment, or other fire equipment and appliances, buildings and sites therefor, or sources of water supply and materials therefor, for the establishment and maintenance of lines of fire-alarm communications, for the payment of firefighting companies or permanent, part-time, or volunteer firefighting, emergency medical service, administrative, or communications personnel to operate the same, including the payment of any employer contributions required for such personnel

2

under section 145.48 or 742.34 of the Revised Code, for the purchase of ambulance equipment, for the provision of ambulance, paramedic, or other emergency medical services operated by a fire department or firefighting company, or for the payment of other related costs.

{¶ 4} In November 2015, the voters of the village of Georgetown approved a 2.4-mill tax levy to fund the operation of the village's fire services. But at a meeting on July 12, 2018, the council of the village of Georgetown approved Ordinance No. 2018-1179, which declared the necessity to levy a tax of 9.5 mills for the purposes spelled out in R.C. 5705.19(I), i.e., to pay for equipment and personnel relating to firefighting and emergency medical services ("EMS"). The ordinance called for submission of the levy to the voters at the November 6, 2018 election and, if approved, for the first collection to occur in 2019.

{¶ 5} At the same July 12 meeting, the council passed a motion by which it committed itself to repeal the 2.4-mill tax if the voters approved the 9.5-mill levy.

{¶ 6} At a subsequent meeting on July 26, the council adopted Ordinance No. 2018-1181, placing a continuing 9.5-mill tax levy on the ballot. The voters approved the measure on November 6, 2018. True to its word, the village council promptly repealed the 2.4-mill levy.

*B. The petition to place on the ballot the question*

*whether to reduce the 9.5-mill levy*

{¶ 7} R.C. 5705.19, the statute that sets out the framework for imposing a levy in excess of the ten-mill limitation, also provides three methods for reducing a levy that was previously approved under R.C. 5705.19(I):

A levy for one of the purposes set forth in division * * * (I) * * * of this section may be reduced pursuant to section 5705.261 or

5705.31[1] of the Revised Code. A levy for one of the purposes set forth in division * * * (I) * * * of this section may also be terminated or permanently reduced by the taxing authority if it adopts a resolution stating * * * that the millage is excessive and the levy shall be decreased by a designated amount.

R.C. 5705.19(AAA)(5). R.C. 5705.261, incorporated by reference as one method for reducing a tax levy, provides that "[t]he question of decrease of an increased rate of levy approved for a continuing period of time by the voters of a subdivision * * * may be initiated by the filing of a petition with the board of elections." Thus, the Revised Code permits the electors of a subdivision to place a levy-reduction question on the ballot, at least under some circumstances.

{¶ 8} On August 7, 2019, nine months after voters approved the 9.5-mill levy, circulators submitted to the board of elections a "Petition for an Election on the Decrease of an Increased Rate of Levy Approved for a Continuing Period of Time." The petition proposed a ballot measure to reduce the rate of the levy from 9.5 mills to 2.5 mills.

{¶ 9} On August 9, the solicitor for the village of Georgetown, Joseph J. Braun, filed a protest against the petition on behalf of the village. The protest argued that the petition was substantively invalid because under R.C. 5705.261, a referendum may be had only on the question whether to decrease an *increased* rate of levy not an original levy.

{¶ 10} The Brown County Board of Elections held a meeting on August 13, 2019. The board determined that the petition required 128 valid signatures to qualify for the ballot. The petition contained 143 signatures, of which the board invalidated 26. Thus, the petition fell short by 11 signatures.

---

1. R.C. 5705.31(D) requires a county budget commission to reduce certain levies under circumstances not relevant here.

**{¶ 11}** Of relevance here, the board invalidated 13 printed names, marking them "NG" (not genuine), because, as attested to by the director of the Brown County Board of Elections, the signatures "were in printed form, and did not match voter registration records." These invalidated signatures purported to be the signatures of Charlie Napier, Jane Pack, Beth Napier, Joseph Fulton, Dennis Passwater, Jason Linkous, Tim Manning, Connie Weber, David Watson, Mandy Middleton, Ronda Colliver, Nathan Adkins, and Don Worthington. The board members therefore voted to disallow the petition based on the lack of valid signatures. The board's minutes do not reflect any discussion of the protest, which was rendered moot by the board's vote. (There are no transcripts from the board's meetings in the record.)

**{¶ 12}** The next day, August 14, a petition circulator named Mike Napier asked the board to reconsider its decision. On August 26, the village solicitor wrote a letter to the board of elections opposing the request for reconsideration. He argued that the board had correctly invalidated petition signatures that were printed rather than in cursive. In addition, the letter stated that the village "incorporate[d] by reference its substantive concerns about the Petition included in its previous filing with the Board."

**{¶ 13}** The board of elections met again on August 29. At the meeting, Napier presented testimony and provided the board with two documents, each containing the following preprinted declaration:

> To Brown County Board of Elections:
>
> We the undersigned electors of the Village of Georgetown respectfully printed our names instead of signing the petition for an election on the decrease of an increased rate of levy approved for a continuing period of time for the Georgetown fire and EMS at the election held on the 6th of November 2018.

Below the text appeared the printed names and signatures of 12 of the people whose purported signatures on the petition had been invalidated. Of the 13 people listed above, only Dennis Passwater did not sign the declaration.

{¶ 14} The board compared the 12 signatures on the declarations submitted by Napier to its voter-registration records, and it determined that the signatures were genuine. Having now verified an additional 12 signatures, the board unanimously voted to certify the measure to the ballot. The village solicitor then argued his substantive challenges to the petition, and the board voted three to one to overrule his objections.

### C. Procedural history

{¶ 15} Two business days later, on September 3, the village filed a complaint for a writ of prohibition in this court. Because the complaint was filed within 90 days of the November 5 election, the case was automatically expedited pursuant to S.Ct.Prac.R. 12.08(A)(1). The board of elections filed an answer, the parties filed evidence, and the matter is fully briefed.

## II. Legal analysis

{¶ 16} Three elements are necessary for a writ of prohibition to issue: the exercise of judicial (or quasi-judicial) power, the lack of authority for the exercise of that power, and the lack of an adequate remedy in the ordinary course of law. *State ex rel. Elder v. Camplese*, 144 Ohio St.3d 89, 2015-Ohio-3628, 40 N.E.3d 1138, ¶ 13. In its merit brief, the board of elections expressly concedes that it exercised quasi-judicial power, and we therefore express no opinion on the subject.

{¶ 17} The village has raised two propositions of law in opposition to placement of the levy-reduction measure on the ballot. First, the village alleges that the board acted unreasonably and arbitrarily when it found that the petition contained a sufficient number of valid signatures. And second, the village continues to challenge the substantive validity of the ballot measure.

6

*A. First proposition of law: The petition did not have a*
*sufficient number of valid signatures*

**{¶ 18}** In its first proposition of law, the village challenges the board's validation of 12 additional signatures based on the documents submitted by Napier. Those 12 signatures are the difference between the petition's meeting the requirements necessary to put the measure on the ballot or falling short. This proposition involves the second element of the prohibition analysis: whether the board's exercise of power was unauthorized by law. To answer this question, "we must determine whether the board acted fraudulently or corruptly, abused its discretion, or clearly disregarded applicable law." *State ex rel. Brown v. Butler Cty. Bd. of Elections*, 109 Ohio St.3d 63, 2006-Ohio-1292, 846 N.E.2d 8, ¶ 23. The village asserts that the board abused its discretion and disregarded clearly established law when it validated the 12 signatures.

**{¶ 19}** Specifically, the village contends that printed signatures are automatically invalid, because "the legislature expressly require[s] them to be in cursive." But one of the cases relied on by the village, *State ex rel. Green v. Casey*, 51 Ohio St.3d 83, 554 N.E.2d 1288 (1990), is no longer good law.

**{¶ 20}** As *Green* demonstrates, there was a time when Ohio law required a valid signature to be in cursive. We deduced this result from statutory language that was substantively the same as that in current R.C. 3501.38(B), which states that each petition signer "may also print the signer's name, so as to clearly identify the signer's signature." In *Green*, this court determined that R.C. 3501.38(B) "implicitly require[d] signatures to be written in cursive." *Green* at 85. However, Am.Sub.H.B. No. 95, 150 Ohio Laws, Part I, 396, 1157, effective September 26, 2003, added a new section to the election statutes, R.C. 3501.011, which eliminated the cursive requirement this court had discerned in *Green*. *See State ex rel. Van Auken v. Blackwell*, 10th Dist. Franklin No. 04AP-952, 2004-Ohio-5355, ¶ 19 (noting that R.C. 3501.011 "effectively overrules" *Green*).

**{¶ 21}** Under current law, a "signature" on a petition means the elector's "cursive-style legal mark written in that person's own hand." R.C. 3501.011(A). But the requirement of a cursive signature is subject to an exception: if an elector's "legal mark," as found on the elector's voter-registration card, is a printed signature, then the petition signature may also be printed. R.C. 3501.011(C).

**{¶ 22}** The village argues that even under R.C. 3501.011, the board erred because the printed signatures did not match the legal marks on the voter-registration forms on file with the board of elections. According to the village, the legal marks on file are in fact in cursive and therefore the exception for printed signatures on a petition does not apply. To prove this point, the village has submitted the voter-registration forms of 15 voters.[2] However, this precise argument has already been rejected in *State ex rel. Crowl v. Delaware Cty. Bd. of Elections*, 144 Ohio St.3d 346, 2015-Ohio-4097, 43 N.E.3d 406.

**{¶ 23}** Boards of elections have a statutory duty to "[r]eview, examine, and certify the sufficiency and validity of petitions and nomination papers." R.C. 3501.11(K)(1). As part of that duty, the boards are required to compare petition signatures with voter-registration cards to determine if the signatures are genuine. *State ex rel. Yiamouyiannis v. Taft*, 65 Ohio St.3d 205, 209, 602 N.E.2d 644 (1992). However, the Revised Code "does not impose on [the boards of elections] the responsibility to enforce R.C. 3501.011 by policing petition signatures for nonconforming legal marks." *Crowl* at ¶ 10. Thus, we held in *Crowl* that once the board of elections determined that the mismatched signatures were genuine, based

---

2. Some of these exhibits are not relevant. Dennis Passwater did not sign the declaration, so his signature was never validated by the board. The signatures of Kimberly Spurlock and Patricia Lewis were invalidated by the board for unrelated reasons and were never counted. And the signature of Amanda Lykins, which was in cursive, *did* match the legal mark on file and was never challenged. On the other hand, the registration form for David Watson, one of the 12 electors who signed both the petition and the declaration, is not in the record.

on affidavits from the signatories, it was an abuse of discretion to invalidate them. *Id*. at ¶ 11.

{¶ 24} *Crowl* built on the foundation laid by *State ex rel. Scott v. Franklin Cty. Bd. of Elections*, 139 Ohio St.3d 171, 2014-Ohio-1685, 10 N.E.3d 697. That case involved a signature mismatch between a cursive petition signature and a printed voter-registration-card signature, *id*. at ¶ 23 (Kennedy, J., concurring in judgment only), the inverse of the scenario in the present case. The voter appeared before the board of elections and testified that she had signed the petition in cursive at the instruction of the circulator. *Id*. at ¶ 7. We held that because the board conducted a hearing,

> it was an abuse of discretion for the board to disregard the evidence that hearing produced. Once the board was satisfied that the signature on the petition was [the voter's], it should have declared the signature valid and placed [the relator's] name on the ballot.

*Id*. at ¶ 19. Although the caselaw speaks in terms of establishing whether a *signature* is genuine, *Crowl* and *Scott* explain that the duty of the boards of elections is to establish the authenticity of the *elector*, not the signature.

{¶ 25} Having received evidence that the 12 printed names on the petition *did* belong to eligible electors and had in fact been placed on the petition by those electors, the board would have abused its discretion if it had disregarded that evidence and continued to find the signatures invalid. The village challenges this conclusion by asserting that the declaration signed by the electors does not come close to "satisfying the evidentiary standard needed for the signatures to be considered valid." But it is well established that when reviewing a factual determination made by a board of elections, we will not substitute our judgment "when there is conflicting evidence on the issue." *State ex rel. Simonetti v. Summit*

*Cty. Bd. of Elections*, 151 Ohio St.3d 50, 2017-Ohio-8115, 85 N.E.3d 728, ¶ 19. Here, there is not even conflicting evidence; the signed declaration is the only evidence in the record on the issue.

{¶ 26} In its reply brief, the village invokes our decision in *State ex rel. Heavey v. Husted*, 152 Ohio St.3d 579, 2018-Ohio-1152, 99 N.E.3d 372. The relators in *Heavey*, prospective candidates who failed to qualify for the statewide ballot, challenged the rejection of a number of their petition signatures by five county boards of elections. They alleged that one board had rejected 32 signatures based on print/cursive mismatches, but they failed to put into evidence the voter-registration cards to establish that there even *were* print/cursive mismatches. *Id.* at ¶ 10. We therefore rejected the claim as speculative, because there are numerous other reasons why the board might have flagged the 32 signatures as "not genuine." *Id.* The village appears to read *Heavey* as holding that a relator who shows a mismatch will prevail, but *Heavey* never reached that question.

{¶ 27} Finally, the village relies on *State ex rel. Barhorst v. Shelby Cty. Bd. of Elections*, 3d Dist. Shelby No. 17-15-13, 2015-Ohio-4391, but that case actually undermines the village's argument. R.C. 3501.38(E)(1) requires petition circulators to attest to the number of signatures on each part-petition. When a part-petition contains a greater number of signatures than the circulator has attested to, the entire part-petition is subject to invalidation. *Rust v. Lucas Cty. Bd. of Elections*, 108 Ohio St.3d 139, 2005-Ohio-5795, 841 N.E.2d 766, ¶ 11-12. In *Barhorst*, the board of elections invalidated an entire part-petition because there were 30 apparent signatures on the part-petition but the circulator's statement at the bottom of the part-petition indicated only 29 signatures. *Barhorst* at ¶ 2.

{¶ 28} The discrepancy arose from the fact that line 16 contained the printed name "Sean M. Trabue," with an address and date, and line 17 had Sean M. Trabue's name in cursive, with the same address and date. *Id.* The trial court held that line 16 did not contain a signature and granted a writ of mandamus ordering

the board of elections to validate the part-petition, and the court of appeals affirmed. *Id*. at ¶ 7. The court of appeals reasoned that the printed name on line 16 was not a signature, because "[n]o evidence [was] presented to indicate that the printed name was a 'legal mark' used either in normal life by the individual or on his voter registration." *Id*. at ¶ 6, quoting R.C. 3501.011(B) and (C). Thus, the court of appeals allowed for the possibility that the printed name *could* have been valid, if different evidence had been presented. The village expressly concedes this point in its merit brief: "*In the absence of evidence to the contrary*, a printed name on an election document does not constitute an individual's legal signature under R.C. § 3501.011." (Emphasis added.)

{¶ 29} Moreover, *Barhorst* is of dubious precedential value. The question in *Barhorst* was not the validity of the printed name on line 16 but whether the name on that line was even purporting to be a signature. In other words, the conclusion that line 16 did not contain a valid signature (because it was printed) would not cure the violation of R.C. 3501.38(E)(1): circulators attest to the number of signatures on the part-petition, not the number of *valid* signatures. When the same person "signed" the same part-petition on two consecutive lines, once in print and once in cursive, the obvious intention was to *sign* the part-petition once. Therefore, the *Barhorst* court reached the correct result for the wrong reason.

{¶ 30} The village has not shown that the board of elections abused its discretion when it reversed its prior decision to invalidate the 12 petition signatures at issue. We reject the village's first proposition of law.

*B. Second proposition of law: The 9.5-mill tax levy*
*is not subject to reduction*

{¶ 31} In its second proposition of law, the village argues that the board abused its discretion by approving the levy-reduction measure for the ballot, because the proposed reduction from 9.5 mills to 2.5 mills is not a proper ballot measure. As discussed previously, the first sentence of R.C. 5705.261 speaks of

the "question of decrease of an *increased* rate of levy." (Emphasis added.) The village cites two cases as support for its claim that R.C. 5705.261 does not permit this proposed levy-reduction measure to appear on the ballot.

{¶ 32} The first case is *State ex rel. Choices for South-Western City Schools v. Anthony*, 108 Ohio St.3d 1, 2005-Ohio-5362, 840 N.E.2d 582. After voters approved a 9.7-mill operating levy for the South-Western City Schools, a petition was submitted to place on the ballot the question of reducing the rate from 9.7 mills to zero mills. We held that the proposal did not qualify for the ballot under R.C. 5705.261 because it did not seek to *decrease* the rate but rather to repeal the tax altogether. *Id*. at ¶ 42, 55.

{¶ 33} The village asserts that *Choices* is controlling because the reduction of the levy from 9.5 mills to 2.5 mills would be the functional equivalent of a complete repeal: the purpose of the 2018 9.5-mill continuing levy was to allow the village to operate a full-time fire and EMS department, and a 2.5-mill levy will not generate enough revenue to allow full-time operations to continue, so the village would be forced to end full-time operation of its fire and EMS department if the measure to reduce the levy passes.[3]

{¶ 34} Unlike the levy reduction in *Choices*, the proposed ballot issue in this case does not seek to "reduce" the tax rate to zero. The key distinction drawn by the court in *Choices* was between the word *decrease*—meaning " 'to cause [something to] grow less' "—and the word *repeal*—defined as " 'to rescind or revoke * * * from operation or effect.' " *Id*. at ¶ 41, quoting *Webster's Third New International Dictionary* 588, 1924 (1993). Applying these definitions, the measure the petition in this case seeks to put on the ballot is not a repeal, because

---

3. The village attempts to buttress this assertion with the affidavit of Village Administrator W. Tyler Thompson. We decline to consider Thompson's affidavit, which is attached to the village's reply brief filed on September 19, as the village was required to file its evidence by September 13 (within three days after the board's filing of its answer), S.Ct.Prac.R. 12.08(A)(2)(a).

12

if it passes, it will not suspend the operation of the tax levy entirely: the village will continue to receive *some* revenue from the adjusted levy. Moreover, the village's argument is an invitation for this court to assess the reasonableness of proposed tax-levy reductions to determine whether a particular proposed tax-rate reduction would reasonably permit the subdivision to maintain essential operations. This is precisely the sort of calculus courts are not permitted to engage in. *See In re Adoption of B.I.*, 157 Ohio St.3d 29, 2019-Ohio-2450, ___ N.E.3d ___, ¶ 32 ("As members of the judiciary, ours is not the realm of creating policy").

{¶ 35} Alternatively, the village cites *State ex rel. Taxpayers for Westerville Schools v. Franklin Cty. Bd. of Elections*, 133 Ohio St.3d 153, 2012-Ohio-4267, 976 N.E.2d 890, in support of its assertion that the proposed ballot measure—reduction to a 2.5-mill levy—does not qualify for the ballot because it seeks to decrease a *new* levy rate and does not seek to decrease an *increase* of the rate under R.C. 5705.261, which allows the initiation of "[t]he question of decrease of an increased rate of levy approved for a continuing period of time by the voters of a subdivision."

{¶ 36} *Taxpayers for Westerville Schools* involved two separate levies that had been approved in different years—one of 1.6 mills and the other of 9.8 mills—for a total of 11.4 mills. Decades after those levies went into effect, the school board asked the voters to approve a replacement levy at the same 11.4-mill amount. *Id*. at ¶ 2-3. After voters approved the same-rate replacement levy in November 2009, the board of elections received an initiative petition seeking a vote on whether to reduce the levy rate to 4.69 mills. *Id*. at ¶ 4, 6. The board of elections initially certified the measure to the ballot, *id*. at ¶ 7, but a protestor argued that the petition

> did not properly propose a levy-decrease question because the November 2009 voter-approved levy did not result in an increased rate of levy for school-district property owners. Instead, the 2009

> levy simply replaced the previous voter-approved levies at the same
> rate of 11.4 mills.

*Id*. at ¶ 8. The board of elections agreed with the protestor and removed the question from the ballot. *Id.* at ¶ 9. Supporters of the measure sought a writ of mandamus restoring it to the ballot.

{¶ 37} We denied the writ, noting that R.C. 5705.261 refers to an increased "*rate of levy*," which "refers to the amount of millage approved by the voters regardless of whether the effective or actual amount of taxes collected or paid has been reduced by other provisions." (Emphasis added.) *Id*. at ¶ 18. Irrespective of whether the aggregate amount of dollars changed, the replacement of two levies totaling 11.4 mills with a single levy totaling 11.4 mills did not constitute an increase in the rate of levy. *Id*. at ¶ 19, 22. Therefore, the initiative petition did not propose a proper question under R.C. 5705.261 and could not appear on the ballot. *Id*. at ¶ 26.

{¶ 38} The village contends that the same logic applies here—the petition to decrease the levy was not proper, because the 9.5-mill levy was an original levy, not an increase levy. The board of elections disagrees with this analogy. The resolution of this dispute depends on which party has correctly interpreted a separate Revised Code section, R.C. 5705.19(AAA)(5).

{¶ 39} The second paragraph of R.C. 5705.19(AAA)(5) provides that a "levy for one of the purposes set forth in division * * * (I) * * * of this section may be reduced pursuant to section 5705.261." According to the board, this language means that the voters can vote to decrease any levy approved for a purpose set forth in R.C. 5705.19(I) (firefighting and emergency medical services), irrespective of whether the levy is a new levy, an increase levy, a replacement levy, or some other type of levy. The village disagrees, essentially arguing that a reduction under R.C. 5705.19(AAA)(5) must still be "*pursuant to* section 5705.261" (emphasis added),

meaning subject to all the terms and conditions set forth in R.C. 5705.261, including the limitation that reductions can only be of increase levies.

{¶ 40} We cannot accept the village's construction of R.C. 5705.19(AAA)(5), because to do so would run afoul of the bedrock principal that a court is obligated to interpret a statute in such a manner " 'as will give effect to every word and clause in it. No part should be treated as superfluous unless that is manifestly required, and the court should avoid that construction which renders a provision meaningless or inoperative.' " *Boley v. Goodyear Tire & Rubber Co.*, 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 21, quoting *State ex rel. Myers v. Spencer Twp. Rural School Dist. Bd. of Edn.*, 95 Ohio St. 367, 373, 116 N.E. 516 (1917). The village's construction of R.C. 5705.19(AAA)(5) renders it moot and of no effect.

{¶ 41} "R.C. 5705.261 is a general provision that specifies the procedure affecting several different types of levies authorized in other Revised Code provisions." *Choices*, 108 Ohio St.3d 1, 2005-Ohio-5362, 840 N.E.2d 582, at ¶ 46. By its own terms, then, R.C. 5705.261 already applies to local tax levies for firefighting and emergency medical services, even without R.C. 5705.19(AAA)(5). So if, as the village argues, R.C. 5705.19(AAA)(5) serves merely to incorporate the terms of R.C. 5705.261, then it is redundant.

{¶ 42} *Taxpayers for Westerville Schools* suggested a construction of R.C. 5705.19(AAA)(5) that does not render it superfluous. The school-district replacement levy at issue in that case was authorized by R.C. 5705.192. In support of our conclusion that the school levy was subject to the "decrease of an increased rate of levy" limitation in R.C. 5705.261, we observed that R.C. 5705.192 does not contain any provision allowing for a reduction of a levy. *Taxpayers for Westerville Schools*, 133 Ohio St.3d 153, 2012-Ohio-4267, 976 N.E.2d 890, at ¶ 25. This court distinguished R.C. 5705.192 from "statutes authorizing other types of school-district levies [that] explicitly note that the amount of taxes may be reduced

pursuant to the levy-decrease provision of R.C. 5705.261." *Id.* Those statutes contain the same or similar phrasing as R.C. 5705.19(AAA)(5): a levy "may be reduced pursuant to section 5705.261 of the Revised Code." *See, e.g.,* R.C. 5705.21(C); R.C. 5705.212(A)(3); R.C. 5705.199(F). The implication is that these provisions—including R.C. 5705.19(AAA)(5) as relevant here—allow levy reductions under any circumstances and are not subject to the "decrease of an increased rate of levy" limitation in R.C. 5705.261.

{¶ 43} Based on the foregoing, we reject the village's second proposition of law.

### III. Conclusion

{¶ 44} For the reasons discussed, we deny the writ of prohibition.

Writ denied.

O'CONNOR, C.J., and FRENCH, FISCHER, DONNELLY, and STEWART, JJ., concur.

KENNEDY and DEWINE, JJ., concur in judgment only.

_____

Strauss Troy Co., L.P.A., Joseph J. Braun, and Jeffrey A. Levine, for relator.

Zachary A. Corbin, Brown County Prosecuting Attorney, and Mary McMullen, Assistant Prosecuting Attorney, for respondent.

_____